Estate of James H. Snowden, Deceased, Bankers Trust Company, Executor v. Commissioner.
Estate of James H. Snowden, Deceased v. Commissioner
Docket No. 7237.
United States Tax Court
1947 Tax Ct. Memo LEXIS 109; 6 T.C.M. (CCH) 945; T.C.M. (RIA) 47231; August 15, 1947
Thomas Kiernan, Esq., and E. W. Pavenstadt, Esq., for the petitioner. James C. Maddox, Esq., for the respondent. KERN
Memorandum Findings of Fact and Opinion Respondent determined a deficiency in the income tax liability of petitioner's decedent for the year 1921 in the sum of $168,278.34, and also determined that a part of this deficiency was "due to fraud with an intent to evade tax". Petitioner *110 alleges error as to both these determinations and also contends that the determination of any deficiency and assessment of any tax is barred by the statute of limitations and that the determination was erroneously addressed to it since its fiduciary capacity as executor of the decedent's estate had been terminated prior to such determination. Respondent in his answer alleged that "the * * * return of petitioner's decedent * * * was false, and the making of such return * * * was with * * * fraudulent intent * * *" Findings of Fact Petitioner, Bankers Trust Company, is a New York corporation which has its principal office at 16 Wall Street, New York, N. Y. On September 15, 1930, petitioner was duly appointed by the Surrogate's Court, County of Suffolk, State of New York, to act as executor of the etate of James H. Snowden, who had died on July 30, 1930. Prior to November 4, 1918, James H. Snowden, hereinafter referred to as the decedent, his brother George G. Snowden, hereinafter referred to as George, and Henry McSweeney were members of a partnership called Snowden Brothers & Company. On November 4, 1918, the partnership transferred all of its assets to Snowden & McSweeney Company, *111 a corporation, in exchange for all of its stock, consisting of 30,000 shares. One-third of these shares were issued to the decedent. Decedent and these two business associates were all men of considerable means. In about July, 1916, the decedent, George and McSweeney entered into a venture with Henry C. Mount for the acquisition and development of oil leases in Mexico. Mount had been acquainted with decedent for some years and had spent much time in Mexico seeking and developing oil properties. Mount represented to the decedent and the other that he was in position to obtain some oil properties in Mexico which had excellent prospects but that he required financial assistance to meet various obligations in connection with the acquisition of the properties. The initial agreement between Mount and the others was quite loose. The initial offer of the Snowdens and McSweeney to Mount was that they would furnish such money as required up to $5,000 and Mount was to do all the work in obtaining and developing the properties. [1] For his efforts Mount was to receive a one-eighth interest in the venture. Mount desired to participate in the venture on an equal basis with the others, namely, a *112 one-fourth interest, except that his portion of the investment was to be borne by the others and recovered by them out of the profits of the venture. Mount returned to Mexico and undertook to acquire the oil properties. He began taking the oil leases in his own name with the thought of eventually conveying them to a Mexican corporation which was to be organized to take over all of the holdings of the associates in Mexico. During the latter part of 1916 Mount called upon his associates on several occasions to furnish him with money for his operations. The others cautioned Mount that they did not want to put much money into the venture and desired to proceed slowly and obtain valuable options for oil lands at little cost. They were disturbed by the very unsettled political conditions in Mexico and did not want to take large financial risks. In February 1917 Mount returned to the United States and it was decided that he should participate equally with the others in the venture, that is, each was to have a one-fourth interest. *113 By the time of the February 1917 meeting, and at that meeting, the agreement between the parties to the venture had become more crystallized. Although no formal written agreement had been entered into at this point, it was understood that Mount's activities in Mexico in obtaining oil leases were to be on behalf of the venture and that he was to convey all leases which he might acquire to two Mexican corporations which were to be organized. It was also understood that Mount was not to receive any commissions or royalty rights in connection with such leases for himself; any such commissions or royalties were to be turned over to the joint venture. The Snowdens and McSweeney agreed at this meeting to put $200,000 into the venture. Mount advised, and the other agreed, that considering conditions in Mexico it would be necessary to organize Mexican corporations to which all of their holdings in Mexico would be transferred. At that time Mexico was not under a stable government. There were revolutions or threats of revolution and strong anti-American feeling existed in that country. The primary purpose which decedent and all of his associates in the venture had in proposing the formation *114 of the Mexican corporations was to protect the leasehold properties which they had acquired or would acquire, from revolutionary forces or from any governmental edict expropriating properties belonging to foreigners. The Snowdens and McSweeney had additional reasons for the formation of the Mexican corporations. These were: (1) the desire to limit any personal liability incident to the operation and development of oil leases in Mexico or incident to the acquisition of such leases by Mount, and (2) the possibility thus afforded of taking over Mount's stock in the corporations as a pledge securing the ultimate repayment to the Snowdens and McSweeney of a part of the moneys advanced by them in the carrying on of the enterprise. All of the associates anticipated, in the event that the venture proved successful, the formation of a large corporation which would take over and develop the holdings acquired by the venture, the capital of which would be obtained by the sale of its stock to persons other than the associates. On March 1, 1917, Mount advised George that he was leaving for Mexico in a few days and that he would undertake to organize the two corporations. After Mount returned to *115 Mexico his associates urged him repeatedly to hasten the organization of the Mexican corporations and to transfer the oil leases to them. They also advised him to proceed slowly with drilling operations and limit and reduce his expenditure. At the time they were concerned over the threat of war between the United States and Mexico. Mount frequently called upon his associates for more money to finance the acquisition of additional properties and drilling operations. They advised him from time to time that they had all of the properties which they could handle and that he should not get any more unless he could do so for very little cash. They also advised him that any drilling operations should be handled as cheaply as posible. Up to April 11, 1917, their advances to Mount totaled $73,645. Two Mexican corporations were formed, incorporation being completed on April 26, 1917. The one, Indiana Mexicana Oil Co., was to take the leases in the northern part of the oil field in which Mount was operating on behalf of the venture, and the other, El Tigre Oil Co., was to take the leases in the southern part of the field. Mount was designated as general manager of both companies and his associates *116 became officials of the companies. At this time, or at some unknown subsequent date, Mount also became the president of each company. Frank Kissel, a Mexican attorney, handled the organization of both companies and undertook to transfer the leases held by Mount to the companies. Because of defects in title and other reasons, there was some delay in transferring all the leases to the companies. It was not until September 25, 1917, that the stock of Indiana Mexicana was finally issued on the following basis: 249 shares each to decedent, George and McSweeney, 250 shares to Mount, and 1 share each to three Mexican directors. Stock of El Tigre was issued at the same time in like amounts to the same individuals. This stock was issued pursuant to a resolution of the board of directors of Indiana Mexicana adopted on September 25, 1917, which recited that the stock was being issued to the decedent, George and McSweeney in payment of the amounts of money which had been advanced by them. The resolution contained a proviso that Mount was offering to deposit his 250 shares with "Messrs. Snowden Bros. and Company" to guarantee to Messrs. George G. Snowden, James H. Snowden and Henry McSweeney the *117 fulfilling of certain and determined obligations of the company, and that as soon as these obligations were fulfilled Snowden Brothers was to return the 250 shares to Mount. This deposit of Mount's shares was in compliance with his agreement with the Snowdens and McSweeney that he was to receive no dividends from the earnings of the companies until the other individuals had recovered their investment in the companies. It appears that Mount's shares in El Tigre were similarly deposited with Snowden Bros. & Co. On July 12, 1917, Mount executed a document before a notary public wherein he stated in part: "* * * I, Henry C. Mount, of Tampico, Mexico, do hereby acknowledge that all of the leases that I have taken in my name in Mexico and options and promises of lease and all other transactions to purchase and sell, or anything else whatsoever, have been for the account of Snowden Bros. & Co. of Indianapolis, Indiana, with the exception that I am to be carried for one quarter interest in same after deduction of costs, etc. * * * It is understood and agreed that all of said leases have or will be transferred to the two Mexican corporations, one being Compania Petrolera El Tigre, S.A. *118 , and one being Compania Petrolera Indiana Mexicana, S.A., said Snowden Bros. & Co. are to own three quarters of the capital stock of said Company [Companies] and I am to own one-quarter. It is understood and agreed that all moneys I have paid in acquiring said leases and transacting said business have all been furnished by the said Snowden Bros. & Co., and while legal title has not yet been conveyed, yet it is understood and agreed that this paper is to be in effect an assignment to them of said three quarters interest as aforesaid." Mount's plans for the Mexican operation were grand in scope. He desired to acquire large holdings of property, including undeveloped and developed properties, pipe line rights-of-way, harbor frontage, to engage in substantial drilling operations, and to build pipe lines. He anticipated that eventually a one-hundred million dollar corporation would be organized to operate pipe lines, steamers and other operations in connection with their holdings. Although his associates, particularly George, also anticipated the formation of a corporation whereby they could "clean up", they repeatedly urged him to curtail his expenditures and reminded him that their *119 own resources were not limitless. They also requested him on many occasions to furnish statements as to his expenditures, but Mount frequently failed to furnish such statements until requested several times to do so. Mount excused himself on the ground that he was too busy to compile the statements and that other matters in Mexico pertaining to his operations were more pressing and important. By October 9, 1917, almost all of the interest in oil leases which Mount had acquired on behalf of the venture had been formally transferred to the corporations. The transfer of a few of the leases was delayed past this date because of defects in the leases. No additional leases were acquired by Mount for the venture or by the corporations although Mount submitted a number of prospective leases to his associates, which they turned down. A lease intended to be the property of the wife of decedent and a lease intended to be the property of some business and social acquaintances of decedent were taken in the name of Indiana Mexicana. In the latter part of the summer of 1917 Mount became interested in obtaining a sublease covering a portion of Lot No. 251 in the Municipality of Amatlan, Canton *120 of Tuxpam, State of Vera Cruz. This sublease will hereinafter be referred to as Lot 251. Mount believed this lease to have excellent prospects. Mount described this lease to his asociates in a letter dated November 16, 1917, and addressed to Snowden Bros. & Co., in which he stated in part: "I have told Mr. Childress about a couple of leases which I am trying to secure, which are so good that you should not turn them down. They are Lot #251 Amatlan and Lot 41 Zacamixtle. The first one I can secure as follows: $5,000.00 cash. The present lease owner to receive 45% of the production out of which the Land Owner's Royalty is to be paid. We being obliged to start the work to begin drilling on the property within forty days after the final Contract is made. They to give us ample time to search Title &c., before final Contract is made and money paid * * * "The first lease is about 1500 feet North of the Aguila's 50,000 bbl. well at Los Naranjos. * * * The first lease is 30 acres * * * You have said that you do not want any more leases, nor to put any more money in here &c., but if you turn this down you are making a big mistake. * * * [2]" *121 On November 19, 1917, Mount again wrote Snowden Bros. & Co., stating inter alia: "I have closed up an agreement on 30 Acres of Lot #251 Amatlan, and have taken it in my name. I want our Co. to take it by all means, if not, I want it myself. I expect to close for Lot #41 Zacamixtle and I feel the same way about that. If you turn them down, I have agreed to let Childress in, if he will do all the drilling, pay the cost, &c." Mount sent a telegram to Snowden & Bros. & Co. on November 20, 1917, stating that he had secured Lot 251 in his name. On November 24, he sent another telegram to Snowden Bros. & Co. requesting that they wire him immediately "if our company shall take" Lot 251; he alo requested that he be sent $5,000. Mount followed up his telegram of November 24, with a letter of that date addressed to Snowden Bros. & Co., the portion thereof here pertinent reading: "I have wired you about Lot #251 Amatlan and received no answer. Of course I consider my self bound to place all matters up to you before anything else is done with them. I supposed Mr. Childress had arrived and told you about it so that you could realize what it meant. Opportunities of this kind dont often come *122 to us in the oil game, and for you to turn them down is a great mistake. With our holdings here the very best thing we can do is to grab this sure rich stuff that I am working on, and start wells on it at once, so that inside of six months we will have a production of at least 50,000 barrels per day, with almost a sure chance of it being three or four times that much. * * *" George replied to these telegrams and letters sent by Mount by a telegram dated November 26, 1917, wherein he stated "cannot take more acreage." On October 29, 1917, the El Tigre Oil Co. filed a report with the Mexican Government listing all properties of the company. This report was filed in accordance with a governmental order requiring a report of all properties held by oil companies. This report had to be submitted before January 1, 1918, otherwise the properties would be forfeited. The El Tigre report was prepared by Kissel and signed by Mount as president of the company. The report listed the subleased Lot 251 as a property of El Tigre. At the time this report was prepared Mount still hoped that his associates would take the sublease. On December 2, 1917, the Tampico Amatlan Oil Co., which owned the *123 lease on Lot 251, formally executed a sublease to Mount with respect to 12 hectares of the lot. The original lease covered 18 hectares of the northeast half of the lot. Under the terms of the sublease Mount was obligated to drill within five months and to drill a second well if the first was dry. Tampico Amatlan reserved a 35 percent royalty and Mount was given the right to assign or sublease. After a producing well was drilled on the 12 hectares, Mount was required to drill on the 6 hectares portion of the lot for the account of Tampico Amatlan and was given the right to purchase the production of the 6 hectare plot at 10 cents per barrel plus the 5 percent landowner's royalty. The sublease also required the building of a pipe line; this and the drilling requirements imposed heavy financial obligation on Mount which he was unable to meet himself. The sublease was authorized by the board of directors of Tampico Amatlan on November 30, 1917, and was recorded on December 3, 1917. On the day before the execution of the sublease, Mount assigned 10 percent of the gross production of the 12 hectare portion of the lot to Messrs. White, Kissel, and Hermosillo, who had assisted him in acquiring *124 the sublease. He also agreed to pay them 5 cents per barrel on the production from the 6 hectares, divided equally among them. Pursuant to a telegram of November 30, 1917, from George requesting that he come to Philadelphia promptly, Mount departed for the United States on December 3, 1917, immediately after receiving the sublease on Lot 251. He proceeded to New York City, although the office of his associates was in Philadelphia. He had a number of conferences with them and showed them his statements of account, but he was unable to go over his actual books with them because his Mexican bookkeeper, who had the books, had been unable to enter the United States. He learned that George was suffering from cancer and undergoing treatment at that time. Mount was under obligation to make the $5,000 payment for the sublease on or before January 3, 1918. While he was in the United States at this time he went to two oil men of his acquaintance, Messrs. Gibson and Zahnizer, who had an office in New York City, and offered to assign an interest in the sublease to them. The agreed to Mount's proposition and on January 5, 1918, pursuant to an agreement between Mount, Gibson, and Zahnizer, Mount *125 assigned the sublease to Tepetate Oil Co., a Mexican corporation, which was controlled by Gibson and Zahnizer, subject to every obligation thereof including the partial assignment to White, Kissel, and Hermosillo. Tepetate Oil Co. and Mount entered into a written agreement on January 10, 1918, reciting that a part of the understanding between the parties when Mount assigned the sublease had been that Mount was to receive one-seventh of the net profits of Tepetate from the exploitation of the 12 hectare portion of Lot 251 and one-sixth of the profit from the 6 hectare portion. The agreement provided that there should be an accounting between the parties periodically. Mount returned to Mexico shortly after January 10, 1918, and on January 25, 1918, wrote Snowden Bros. & Co. that Gibson and Zahnizer had succeeded in holding the lease on Lot 251 on which Mount's rights had ceased because he had not paid the $5,000 sum. He also stated that they had "paid the money to offset the Notary's and Stamp charges of $413.78 which Kissel had paid". Tepetate Oil Co. struck oil on Lot 251 on July 2, 1918, and Mount promptly notified Snowden Bros. & Co. that a tremendous well had been brought in *126 on the lot. A few days afterwards Mount proceeded to Philadelphia at the request of his associates and there took up various matters pertaining to their Mexican operations. George Snowden, who was ill, did not attend this conference. Mount then told them that he regretted that they had not taken Lot 251, for if they had he would have had a one-quarter interest in it instead of the much smaller interest he got in his transaction with Gibson and Zahnizer. This was the first time that Mount's associates learned that he had reserved an interest in Lot 251 for himself when he transferred the sublease to Tepetate. McSweeney, who was an attorney, promptly informed Mount that a portion of Mount's reserved interest belonged to the enterprise conducted by Mount, decedent, George and McSweeney, since Mount was under obligation to make acquisitions of this kind in Mexico only on behalf of the venture and, consequently, all of the associates were entitled to this interest. Mount denied that the other three were entitled to participate in his share of Lot 251. However, Mount finally agreed that, since they had gone into the Mexican venture together he would transfer a quarter part of his interest *127 in Lot 251 to each of them under certain conditions. Among these conditions were that his associates would lend him $2,000 a month for 12 months, and that they would advance $150,000 to Indiana Mexicana for use in the development of its properties which had been delayed. He desired the loan of $24,000 in order that he could meet certain heavy financial obligations of his own in connection with certain land in the State of Sonora, Mexico, which he had contracted to purchase. McSweeney and decedent agreed verbally to Mount's terms. After the instrument transferring a part of Mount's interest in Lot 251 had been redrafted a number of times because of changes required by McSweeney, Mount Finally executed a document on October 18, 1918, reciting, inter alia, that he had and thereby did "sell, assign, transfer and set over unto George G. Snowden, * * * James H. Snowden, * * * and Henry McSweeney, * * * their executors, administrators, and assigns, to his or their own proper use and benefit, each an one-quarter interest in the rights and choses in action" to which Mount was entitled under the contract entered into on January 10, 1918, with Tepetate. The instrument expressly provided that *128 Mount reserved to himself a one-fourth interest in these rights and choses in action. This document was never recorded in Mexico. McSweeney and George each executed a power of attorney on November 18, 1918, granting to the decedent power to accept from Mount the assignment and conveyance of a one-quarter interest in the contract of January 10, 1918. Decedent was also given full power to act on behalf of George and McSweeney in all matters pertaining to their respective one-quarter interests in that contract. Some time prior to 1920, the Atlantic, Gulf & West Indies Steamship Lines, acquired from Tepetate a controlling interest in the sublease on Lot 251 which Mount had assigned to Tepetate. After the acquisition of this controlling interest the Atlantic, Gulf & West Indies Steamship Lines, hereinafter referred to as Agivi, transferred this interest to the Atlantic Gulf Oil Corporation, a Virginia corporation, organized for the express. purpose of holding this interest. The stock of Atlantic Gulf Oil Corporation was owned entirely by Agvi and Tepetate. At about the same time, various Mexican corporations were organized for the purpose of exploiting the oil values of that part of *129 Lot 251 covered by the sublease. These Mexican corporations were the Agivi Refining Co., the Agivi Pipeline Co., and the Agivi Terminal Co., and all of the stock of each of them was owned by the Atlantic Gulf Oil Corporation. Mount wrote as follows to Snowden & McSweeney Co. on February 21, 1920: "On the 11th inst. I wrote, signed and delivered to the Atlantic Gulf Oil Corporation, the following authorization and request: 'I hereby authorize you to place to the credit of Snowden & McSweeney Co. of No. 437 Fifth Avenue, New York City all my portion of the profits derived from the productions obtained and transferred from the wells upon the twelve and the six Hectares of lot No. 251 Amatlan, State of Vera Cruz, Mexico, as per my contract with the Compania Petrolero Tepetate S.A. until such time as the Snowden & McSweeney Company may re-transfer the same to me. 'At your earliest convenience kindly inform the Snowden & McSweeney Company of the receipt of this letter as well as the transfer of three-fourths of my rights of the above mentioned contract to James H. Snowden, George G. Snowden and Henry McSweeney, which notice was sent to you over a year ago.' "As per our understanding *130 the foregoing is a transfer to your credit of my profit until such time as the said profits have reimbursed you for the twenty-four thousand dollars which you advanced me at the rate of two thousand per month, from October, 1918, until September, 1919, and for the additional sum of Ten Thousand Dollars, of which I have now received the sum of twenty-five hundred dollars, and may, as per our understanding, re-receive the balance at any time I may request." * * *
Due to George's illness, McSweeney was engaged in September through November, 1918, in conferring with George about the disposition of George's etate. A corporation, Snowden & McSweeney Co., was formed to take over the property of Snowden Bros. & Co., the partnership, and did so on about December 1, 1918. A trust was also created to take over most of George's property, with James H. Snowden, McSweeney, and Pearl M. Snowden, George's wife, as trustees. George died in January, 1919. The advances of $2,000 per month to Mount secured by his interest in the contract of January 10, 1918, were treated by Mount and his associates as a matter separate and apart from other funds advanced by them to him in connection with their *131 Mexican properties. Mount received the $2,000 per month for a period of 12 months. Decedent, McSweeney, Mount and the trustees of the George Snowden Trust on June 2, 1919, formally offered the presidency of each of the Mexican corporations to Frank Hitchcock. This step had been contemplated by the Snowdens and McSweeney for approximately a year. Hitchcock had many important financial and political connections and they thought he might be able to organize the large company which they had hopes for, and finance it. The letter, whereby they made the offer, stated that all of the then stockholders of the corporations, would tranfer to him one-fifth of their respective holdings in the stock of each of the companies in order that he might become the owner of one-fifth of the stock of the companies. It was further provided, however, that Hitchcock would deposit his stock in escrow until the advances of decedent, McSweeney and the George Snowden Trust, then aggregating $463,052.43, had been repaid out of the earnings of the companies. The letter indicated that they expected Hitchock to assist later in the financing of the companies as they were unable to furnish the funds necessary for drilling *132 operations and for transportation and marketing facilities. El Tigre transferred its properties to Indiana Mexicana in 1919. In the summer of 1920 it became apparent that there might be some dispute as to how the profits of Lot 251 were to be determined. Atlantic Gulf Oil Corporation, which then held the sublease, took the position that Mount and his associates were entitled to settlement on the basis of 40 cents a barrel, which was the price received by Atlantic Gulf Oil Corporation at the well. Mount asserted that since the purchaser of the oil at the well, the Agivi Pipeline Co., was actually a subsidiary of Atlantic Gulf Oil Corporation, he and his associates were entitled to share in all the profits received by Atlantic Gulf Oil Corporation and its subsidiaries from the production of Lot 251 deducting only the cost of transportation. Atlantic Gulf Oil Corporation was actually selling the oil through another one of its subsidiaries at about $1.10 per barrel. Atlantic Gulf Oil Corporation also failed to furnish to Mount the periodic statements which it was required to give him. Negotiations were conducted between Mount and his associates and the Atlantic Gulf Ol Corporation *133 in regard to this matter but the parties were unable to reach any agreement. On November 22, 1920, Mount, McSweeney and decedent, and the latter two as trustees for the George Snowden Trust, submitted a written demand for an accounting to Tepetate, the demand stating, inter alia, "James H. Snowden, and Henry McSweeney, and James H. Snowden and Henry McSweeney, Trustees for the Estate of George G. Snowden, deceased, are as you have been previously advised, partial assignees of the rights of Mr. Mount under said contract of January 10, 1918." Mount resigned as president of Indiana Mexicana on December 30, 1920, and was replaced by Hitchcock. Mount was still a stockholder although his shares continued to be physically in the possession of his associates. In November 1920 Whitman, Ottinger & Ransom, a New York law firm, was engaged to represent Mount and associates in their dispute with Atlantic Gulf Oil Corporation. Robert E. Coulson of that firm took charge of the case. Mount discussed the matter with him and supplied him with all the facts pertinent thereto. On March 4, 1921, a suit was instituted in the District Court of the United States, Southern District of New York, in equity, *134 entitled "Henry C. Mount, James H. Snowden, Henry McSweeney, individually, and Pearl M. Snowden, James H. Snowden, and Henry McSweeney, as Trustees under a certain Deed of Trust dated November 7, 1918, executed by George G. Snowden, now deceased, Complainants, vs. Atlantic Gulf and West Indies Steamship Lines, [3] Atlantic Gulf Oil Corporation, and Compania Petrolera de Tepetate, S.A., Defendants." The bill of complaint was signed by each of the complainants and verified by Mount. The bill prayed, among other things, that an accounting be had, that a judgment be entered for the amounts due the complainants, and that the defendants be enjoined from distributing any funds obtained from the sale of oil from the property until the complainants had received all sums to which they were entitled under the contract of January 10, 1918. A temporary injunction was issued after hearing on March 12, 1921. The order, after reciting that jurisdiction had been waived, gave the complainants an equitable lien on all petroleum produced from Lot 251 and on the proceeds which had been or would be derived from the sale *135 thereof. The order also directed the defendants to account to complainants for any oil or the proceeds thereof which had been or would be received from the property, and appointed a Special Master to whom the moneys should be paid by the defendants. After the temporary injunction order was issued, Coulson and counsel for the defendants effected a settlement under the terms of which the defendants were to pay $1,175,000 to the complainants in full satisfaction of all claims of the complainants. Coulson agreed to the settlement, which was reduced to writing, "on behalf of complainants." In an order, dated October 11, 1921, and filed October 13, 1921, the Court, after reciting that a settlement had been agreed upon by the parties, directed that the Special Master pay the sum of $1,175,000 to "Messrs. Whitman, Ottinger & Ransom, as solicitors for the complainants * * * to be accepted and received on behalf of the complainants * * * in full satisfaction of the claims of the complaints * * *." The order also dismissed the complaint. While negotiating the settlement, Coulson addressed a letter to counsel for the Atlantic Gulf Oil Corporation on October 3, 1921, wherein he stated with *136 reference to the proposed stipulation for the settlement: "This stipulation is executed and delivered and is to become effective only upon the express condition that the releases referred to in the stipulation include a proper release running from the TepetateCompany to the Indiana-Mexicana Company, which is the Mexican operating company of the complainants, so as to discharge, in connection with this settlement, all liabilities, represented by notes or otherwise, which still run from the complainants or their Mexican subsidiary to the TepetateCompany in connection with the acquisition by the Complainants, through their Mexican operating company, of an interest in the pipe line right of way from Lot No. 251 to Tecomate." Coulson wrote a letter to decedent on October 4, 1921, to confirm his understanding as to the result of his conferences with decedent, Mount and McSweeney as to the settlement of the Agwi litigation. He concluded his letter with the comment, "As to the matter of the payment over of the fund derived from a settlement, I understand that you will advise me promptly as to whether this is to be paid to the Indiana Mexicana or to the complainants." In August 1921, *137 during the litigation, Mount secured a loan of $20,000 from the Commercial Trust Co., in New York City. Coulson assisted him by introducing him to the president of the Trust Company. The bank required security for the loan and Mount assigned to the bank all of his right, title and interest in the claim against the Atlantic Gulf Oil Corporation, et al., up to the amount of $20,000. In the instrument of assignment, executed on August 29, 1921, Mount recited that he was entitled to a one-fourth interest in the claim then being asserted in the United States District Court against the Atlantic Gulf Oil Corporation, et al. On the same day the following letter was sent to the Commercial Trust Co. by decedent on behalf of Snowden & McSweeney Co.: "Dear Sirs: "Mr. Henry C. Mount informs us that you are about to make advances aggregating $50,000.00 to him, and desire to obtain from us, as an inducement to the making of such loan, a waiver, so far as you are concerned, of any lien or preferred position which we may have as to Mr. Mount's one-fourth interest in a claim against the Atlantic Gulf Oil Corporation and others in connection with profits derived from Lot No. 251 Amatlan, State of *138 Vera Cruz, Mexico (as to which claim an account is now under way in the proceedings in the United States District Court), based upon advances which we have heretofore made to Mr. Mount upon faith of his interest in such claim. "The others interested as complainants with Mr. Mount in the proceeding are Mr. Henry McSweeney, Mr. James H. Snowden, and the Estate of George Snowden. The accounting proceeding has progressed to a point where we are confident that the quarter interest of Mr. Mount will be substantially in excess of your proposed loan to him and our previous advances amounting to $50,000.00. We therefore have no hesitation in postponing our claim against any sums Mr. Mount will receive, to your claim for all or any part of the advances you may make up to $50,000.00. "This letter is intended to evidence our recognition of your right to be repaid your proposed advance out of the first moneys to be received by Mr. Mount from the said claim in preference to the repayment to us of any advances which we have heretofore made to Mr. Mount. Very truly yours, SNOWDEN & McSWEENEY COMPANY, (Signed) J. H. Snowden, V. P." Mount addressed a letter to the Special Master of the proceeding *139 on August 29, 1921, directing him to pay $20,000 to the Commercial Trust Co. out of the first moneys which the Master might have occasion to pay to Mount in connection with the proceeding. Mount also sent a letter to the Commercial Trust Company on August 31, 1921, informing them that there were no prior assignments covering his interest in the claim then being asserted against Atlantic Gulf Oil Corporation, et al., except an assignment of his interest in this claim to cover advances theretofore made to him by Snowden & McSweeney Co., and aggregating $50,000. This communication referred to the fact that Snowden & McSweeney Co. had agreed to subordinate its interest in the claim to the bank's loan. The loan was repaid to the bank on October 14, 1921, by means of a check drawn on the checking account of Indiana Mexicana. While the settlement was being negotiated, some question arose as to the power of the Trustees of the George Snowden Trust to compromise and settle claims arising in connection with the affairs of the trust. After consulting with the attorneys for the Trust, Coulson's firm advised counsel for the defendants in the Agwi suit of its opinion that these Trustees had the *140 power to bring suit and to compromise and settle claims, and that, further, there was no liability on these making payment in settlement to see to the application of funds paid over to the Trustees. On October 13, 1921, Coulson advised Snowden & McSweeney Co., by letter, that the settlement in the Agwi litigation had been concluded and the sum of $1,175,000 had been paid to his firm as solicitors for the complainants. The letter listed fees totaling $106,500, which were being withheld from the gross amount received, and advised that he was therewith transmitting three certified checks for $267,125 each, payable respectively to (1) James H. Snowden, (2) Henry McSweeney, and (3) James H. Snowden, Henry McSweeney and Pearl M. Snowden, as trustees, and a certified check for $247,125 payable to Henry C. Mount. The sum of $20,000 was withheld from Mount's check in order that Coulson might take up Mount's note for $20,000 to the Commercial Trust Co.Snowden & McSweeney Co. acknowledged receipt of these checks on the same day. These checks had been drawn on a special account of Whitman, Ottinger & Ransom. The complainants, on the following day, October 14, instructed Coulson by letter *141 that the fund produced by the Agwi settlement should be paid to Indiana Mexicana. The letter stated: "Referring to the fund produced by the settlement made with the Atlantic Gulf Oil Corporation in the litigation which has been pending in the United States District Court for the Southern District entitled 'Mount, et al. against Atlantic Gulf & West Indies, et al. as we have previously informed you, we were holding the title to the interest merely as Trustees for the Cia Petrolera Indiana Mexicana, S.A. and the interests in question would have been transferred long ago to the Mexican corporation had it been possible to do so without disturbing the litigation then pending - now that the litigation is at an end, we desire that the funds derived from the settlement shall be paid to the Indiana-Mexicana Company, for whom we the undersigned were acting as Trustees. We desire that the funds remaining in your hands after deducting your own fees and the Court costs and the master's fees be paid to the Mexican Company, leaving the Mexican corporation to settle with Mr. Kellogg the moneys due to him as associate counsel, as well as to Messrs. Mattison & Davey, accountants, for accounting work *142 in connection with the litigation; For the making of such payment this will be your full and satisfactory acquittance. Very truly yours, (Signed) James H. Snowden, (Signed) Henry McSweeney, Individually and as Trustees of the Estate of George C. Snowden, (Signed) Henry C. Mount." The four checks payable to the complainants were then deposited in the law firm's special account and a single check payable to Indiana Mexicana was drawn on the account for the sum of $1,083,500. This check was dated October 13, 1921, and certified on October 15. James H. Snowden, as vice-presidet, signed a receipt for the check on behalf of Indiana Mexicana. Mount, McSweeney and decedent, individually and the latter two as trustees of the 'George Snowden Trust, then assigned all of their rights and interests in the contract of January 10, 1918, to Atlantic Gulf Oil Corporation. The instrument of assignment was executed by them on October 14, 1921, and a few days later by Pearl M. Snowden, the other trustee. This assignment was made as part of the settlement. McSweeney requested Mount for the latter's copy of the instrument of October 18, 1918, whereby Mount had transferred to George, McSweeney and *143 the decedent, respectively, a one-quarter interest in his rights in Lot 251 under the January 10, 1918, contract. This request was made on October 13, 1921, and upon Mount's producing his copy, McSweeney destroyed it. On or about October 14, 1921, Mount and his associates discussed the necessity for his early return to Mexico to take care of some pressing matters in connection with their operations. At or about that date and at the time the letter of October 14, 1921, addressed to Coulson was signed by decedent, McSweeney and Mount, it was agreed between them that advances in the total amount of $250,000 would be made to Mount out of which his prior advances would be repaid and that Mount would give his notes to Indiana-Mexicana covering the amounts of the advances to be made him pursuant to this agreement. Mount, at that time, had received advances of over $40,000 and was also indebted to outside parties. The question of the individual capacities of Mount and his associates with respect to the contract of January 10, 1918, was never discussed among them before October 14, 1921. Prior to that time nothing was said to Mount by his associates in reference to their acting as trustees *144 for Indiana Mexicana in that matter. In July 1921 Coulson arranged for a firm of accountants to send a representative to Mexico to examine the books of the Atlantic Gulf Oil Corporation and its subsidiaries with respect to the sum due the complainants in the Agwi litigation. A check for $2,000 was drawn on July 30, 1921, against the bank account of Indiana Mexicana as an advance to the accountant for expenses. At the time this check was drawn the balance of the bank account was $1,167.74 and the funds needed to cover the check were provided by a deposit coming from Snowden & McSweeney Company on August 1, 1921. The balance of the fee of the accounting firm in connection with the Agwi litigation in the amount of $10,965.27 was paid by Indiana Mexicana on October 19, 1921. Atlantic Gulf Oil Corporation, on October 25, 1921, executed a release to Mount, decedent and McSweeney, individually, and Pearl M. Snowden, decedent and McSweeney as trustees of the George Snowden Trust. The release did not run to Indiana Mexicana. On November 1, 1921, decedent wrote a letter to Charles S. Whitman of Whitman, Ottinger and Ransom complaining of the attorneys' fees charged by that law firm in *145 connection with the Agwi litigation. In this letter he referred to the fact that "Mr. McSweeney, one of the four equally interested parties in the case" had made certain agreements with respect to the settlement and attorneys' fees. The law firm addressed a letter to "James H. Snowden, Snowden & McSweeney Co." on November 10, 1921, giving a final accounting of the settlement money received by it. Subsequently, after certain negotiations with the law firm with respect to the matter of their fee, the firm wrote Hitchcock on December 15, 1921, to the effect that it would return the retainer fee which it had received at the inception of the Agwi case. This letter requested Hitchcock to advise as "to whose order your clients wish our check for $5,000 in settlement of this matter drawn." Hitchcock replied on the following day that their check "should be drawn to the order of the Indiana Mexicana Oil Co., which company paid the retainer and has since received from Mount and his associates the funds recovered in the settlement." In its letter of December 19, 1921, Whitman, Ottinger and Ransom, in transmitting its check for $5,000 to Hitchcock, made the comment, "your letter of December 16th, *146 is apparently in error as to the payment of the retainer in the above matter, our records showing that the retainer was paid us by Snowden & McSweeney Co. We assume, however, that your clients desire, in any event, this credit to run in favor of the Indiana Mexicana Co. as the real party at interest." A dispute also arose as to the amount of fees to be paid to an attorney named Kellogg who had rendered services to the complainants in connection with the Agwi litigation. Kellogg had been retained by Mount as advisory counsel in the suit, and decedent had approved of this step. However, McSweeney, and the trustees of the George Snowden Trust had no knowledge of Kellogg's employment until about October 5, 1921. The George Snowden Trust owned stock in Indiana Mexicana and in the Snowden & McSweeney Co. Pearl M. Snowden had no individual stock interest in Indiana Mexicana aside from the indirect interest through the trust. Darwin W. Maurer was engaged by the decedent on or about December 1, 1920, to act as general manager for Indiana Mexicana in Mexico in place of Mount. As general manager he had charge of all operations including office management and field supervision. At the time *147 of his employment Maurer was instructed by the decedent that he was to have entire charge only of such properties as belonged to Indiana-Mexicana, but was not to have charge of the retained interest in Lot 251. Maurer's employment by Indiana Mexicana ended in December 21, 1922. He spent the entire period of his employment in Mexico except for occasional trips to New York for conferences. While Maurer was associated with Indiana-Mexicana it was engaged in developing its holdings including the drilling of wells and operating producing wells. During his period of employment he did not have anything to do with Lot 251, although he knew its location and passed it whenever he was en route to properties of the company in the so-called "lower country". An organization was maintained in the field for the purpose of performing the usual duties in a producing oil field. In 1921 Indiana-Mexicana received considerable gross income from the production of two wells. From one of them it received in that year gross revenue in the sum of $122,186.11. During the course of the year, as production progressed, the gross receipts from each well decreased. In 1922 Indiana-Mexicana had an interest in only *148 one producing well. While Maurer was general manager of Indiana Mexicana monthly lease reports were prepared and submitted to the New York office. These reports were submitted to show the expenditures of the company in connection with its various leases. One Zaleta, who had charge of lease rental payments for the company, prepared these reports. Each report showed the expenditures which had been incurred in connection with each lease in the particular month which the report covered, togethed with the total to date. The lease reports for the months of April, May, June and September 1921 each list Lot 251 and show the amount of 1,463 pesos 89 centavos as the total cost of the lease to date. Indiana Mexicana requested Maurer on December 8, 1921, to inform it as to the total amount disbursed by Mount and by the company for account of Lot 251. Maurer replied that, according to the books, the company had disbursed 1,486 pesos 55 centavos for that account, and that he had no record of the amount disbursed by Mount, if any. In the early part of 1921 Maurer employed Oswald Grosvenor, a chartered accountant, to prepare a set of books for Indiana Mexicana in Mexico. In December 1921 Grosvenor *149 was called to New York for the purpose of discussing the entries to be made on Indiana-Mexicana books in connection with the Agwi settlement. The New York office had decided that since certain tax questions were involved, these entries should be explained orally to Grosvenor in order to avoid any misunderstanding and "thereby make those interested liable to a very heavy income tax." In a report on the work which he performed during the period December 6 to 19, inclusive, Grosvenor stated: * * *
"With regard to the proceeds of the Agwi Suit, the Auditor of that Company has agreed that the Local Auditor in Tampico should consult with me before recording the payment to us of the $1,175,000.00. It is agreed that the money shall appear on their Tampico Books as payment to the Cia. Petrolera Indiana Mexicana, S.A. "Mr. Lorenzo Roel will prepare an assignment in English, later to be translated into Spanish, in which Messrs. Snowden, McSweeney, Mount, and Estate of the late G. G. Snowden transfer all rights to Lot #251 Amatlan to the Cia. Petrolera Indiana Mexicana, S.A. This document will bear a date prior to the final settlement of the suit, the consideration being nominal, say, *150 one hundred pesos. "The Cia. Petrolera Indiana Mexicana will hand the Agwi Co. in Tampico a receipt for $1,175,000. - stamps to the value of $1,175.00 adhered and cancelled." Two sets of books were kept on behalf of Indiana Mexicana, one in Spanish, in Mexico, and one in the New York office. They were not duplicates. The New York books of Indiana Mexicana were kept under the supervision of William Garrity, the auditor of Snowden & McSweeney Co. Garrity was not an employee of the Mexican company. At some date prior to July 30, 1921, decedent informed Garrity of the suit which had been instituted against Agwi. Decedent told Garrity that the interest in Lot 251 having been held in the names of the individuals, the individual ownership would be continued for purposes of the suit. Decedent, in a conversation with Garrity, told him that the action was being brought in New York in the names of the individuals as trustees for Indiana-Mexicana and that he wanted all disbursements in connection with the suit to be made by Indiana Mexicana. The advance of $2,000 to Mattison & Davey on July 30, 1921, was drawn on the Indiana Mexicana account in accordance with this instruction. In December *151 1921, or January 1922, L. J. Roel, a Mexican lawyer having offices in New York City, was engaged to prepare such documents as were necessary to transfer the interest in Lot 251 from Mount to Indiana Mexicana. Roel drafted a contract between Mount and Katherine M. Turner, as "gestor oficioso", or unauthorized agent, of Indiana Mexicana whereby Mount transferred to Indiana Mexicana all of his rights under the agreement of January 10, 1918, between Mount and Tepetate. The contract recited that the sum of $7,000 had been received by Mount in full satisfaction for the transfer. Katherine M. Turner was an employee of Snowden & McSweeney Co. and obligated herself in the contract to have Indiana Mexicana ratify it. Roel prepared this contract in Spanish and also prepared an English translation thereof. Both copies were prepared without dates by Roel. On or about April 19, 1922, Mount actually signed both the English and Spanish copies of the contract. No dates appear in the Spanish copy but the date, October 7, 1921, was written into the English copy as the purported date of execution. Mount signed these instruments at Hitchcock's request. One of the two individuals who witnessed the signatures *152 was an employee of Snowden & McSweeney Co., and the other was Hitchcock's secretary. The notary public before whom the instruments were executed was in the employ of Snowden & McSweeney Co. On the same day, April 22, 1922, Hitchcock, on behalf of Indiana Mexicana, executed an instrument whereby he ratified the transfer from Mount to the company. The signature of the same witnesses and notary public appear on the ratification document as on the instrument executed by Mount. Hitchcock executed the instrument of ratification in accordance with the authority granted to him by the directors of Indiana Mexicana at a meeting held on April 19, 1922. Mount signed the minutes of this meeting on that day, although he was not present. On the same day Mount also signed the minutes of a board of director's meeting purportedly held on November 3, 1921, which stated that the directors "ratified and approved" the action of the complainants in the Agwi suit, "who, as trustees for the stockholders of the Indiana Mexicana Oil Company, brought suit against the Agwi Company, in accepting for the Company, in settlement of said suit, a payment of * * * $1,175,000." These minutes recite that Mount was present *153 at the meeting, although he was not present and did not sign the minutes until April 19, 1922. The transfer from Mount to Indiana Mexicana and the ratification thereof by Hitchcock were recorded in Mexico on June 19, 1922. During the latter part of 1921 and the early part of 1922, Mount received, by way of credits on his various indebtednesses, or by way of advances to him or on his account, the total sum of approximately $250,000. These credits or advances were made by Indiana Mexicana. Mount's stock in that company continued to be held by decedent, McSweeney and the Estate of George, pursuant to the 1917 arrangements. In 1922 counsel for George's trustees suggested tht steps be taken to secure repayment of these amounts from Mount, and it was decided by decedent, McSweeney and George's trustees that a collateral note and stock power be prepared for Mount's signature. There is no evidence that he signed such notes or that the amounts were ever collected. The partnership of Snowden Bros. & Co. was dissolved and its assets transferred to Snowden & McSweeney Co., a corporation, on November 4, 1918. At that time one-third of the amount which had been advanced by the partnership *154 to Mount for leases and expenses in Mexico during the period August 1, 1916, to November 1, 1918, was set up on decedent's books [4] in an account designated "Mexican Investment", and amounting to $116,321.55. On December 31, 1918, $49,800 was transferred from the Mexican Investment account to an account called "Mexican Incorporation". The entry in the latter account consists of two items, "El Tigre 249 sh. stock at 100.00" and "Indiana-Mexicana 249 sh. stock at 100.00", each item totaling $24,900. Between April 15, 1919, and December 31, 1920, decedent made further advances *155 through Snowden & McSweeney Co. totaling $184,767.16, which were reflected in his "Mexican Investment" account. At the end of 1920, this account showed a balance due to decedent amounting to $236,365.98. On June 30, 1921, $234,926.28 of this account was transferred to an account receivable from Indiana Mexicana Oil Co., and the remainder of $1,439.70 was applied to pay off a balance in that amount owing by decedent to Indiana Mexicana and El Tigre. The account receivable was increased to $236,456.88 on October 31, 1921. The aggregate value of decedent's stock in the Mexicana corporations, which had originally been entered in his "Mexican Incorporation" account at $49,800, was written down on May 15, 1921, to $24,900, and the difference, $24,900, was charged to his profit and loss account. [5]
*156 After receiving the sum paid in settlement of the Agwi litigation Indiana Mexicana paid $225,000 to decedent on November 4, 1921, and $25,000 on December 1, 1921. The company and decedent treated these payments as "payments on account", and decedent decreased his "Indiana-Mexicana Oil Co." account by these amounts. On December 31, 1921, this account was written up to $5,284.36 by a credit to profit and loss of $18,827.48, with the explanation that the entry was required to adjust decedent's books to conform with those of Indiana Mexicana. On January 3, 1922, the "Indiana-Mexicana Oil Co." account receivable was closed upon receipt of $5,284.36 from the company. In his Federal income tax return for the calendar year 1921, decedent deducted a loss of $16,644.74. Included in this loss was the following item, as set forth in the return: Advances not reimbursed Advanced Reimbursed Loss Indiana Mexicana Oil Co. $24,900.00 $18,427.48 $6,472.52 [6]
Indiana Mexicana's office in Mexico was discontinued in about 1923 *157 or 1924. The New York office was continued in conjunction with the office of Snowden & McSweeney Company and Hitchcock remained as president until about 1927. When Hitchcock left the company there were no operations in Mexico on behalf of the company except for one lease which was abandoned in 1928. At that time a survey of the company's leases in Mexico showed that they were in bad condition and that it would cost a great deal of money to re-establish the company. The venture then came to an end and the books, or the greater part of them, were placed in storage. During the period from December 31, 1918, to October 4, 1921, the Mexican corporations in Mexico made payments totaling pesos 1486.55 in connection with Lot 251. These payments were recorded in a memorandum book of account in which were listed rental and other items of expense pertaining to their leases. Prior to the settlement of the Agwi litigation, Indiana Mexicana in New York made two payments in connection with Lot 251. These were a payment of $5,150 in September 1921 to a Mexican lawyer in New York for legal services performed by his Mexico City office and the advance of $2,000 to Mattison and Davey, accountants, hereinabove *158 referred to. Petitioner, on September 18, 1930, requested of the respondent, in accordance with sections 275 (b) and 503 of the Revenue Act of 1928, that all income taxes of the decedent be determined and assessed within one year. On February 15, 1932, petitioner was advised by the Commissioner that the audit of the income tax return for the period ending with the death of the decedent disclosed a deficiency of $532.51; petitioner paid this deficiency In response to an inquiry of the petitioner the collector of internal revenue for the third district of New York advised petitioner in 1932, and again in 1934, that his records disclosed no outstanding tax liabilities of the decedent. Petitioner, on or about August 26, 1940, filed with the Surrogate's Court, Suffolk County, New York, a "Petition on Executor's and Trustee's Accounting". The petitioner recited, among other things, that petitioner had filed accounts as executor and trustee, which accounts were judicially settled and allowed, and petitioner discharged as to all matters embraced therein, and that petitioner desired that its account for the period from October 7, 1935, the date of its last accounting, through June 25, 1940, be *159 judicially settled and allowed. The account submitted by petitioner for this period was designated "Executor's Final Account". The Surrogate, by a decree of December 16, 1940, directed that the balance of principal and income remaining in petitioner's hands as executor be distributed and that petitioner retain with the estate records certain securities stated to be worthless. The court further ordered that upon payment of the amounts in distribution, the petitioner as executor "be * * * discharged of and from any and all responsibility or accountability for and in respect of any and all matters embraced in this accounting." Petitioner made the payments in distribution as ordered by the Surrogate's decree, and thereafter did not have any assets of value as executor of the decedent's estate. The payments were made before petitioner had any notice or information that an investigation was being made concerning the decedent's income tax return for 1941. The investigation began in about April 1941, and did not come to petitioner's attention until May or June of that year. The decedent filed his Federal income tax return for the year 1921 with the collector of internal revenue for the *160 district of Florida on April 14, 1922, pursuant to an extension of time granted. On December 5, 1944, respondent determined a deficiency of $168,278.34 in decedent's income tax liability for the year 1921. In the statement attached to the determination of deficiency the loss of $6,472.52 shown on decedent's return for that year was disallowed on the ground that it did not represent an allowable deduction from gross income. Included in income in the notice of deficiency was the sum of $255,284.36, representing decedent's share of the net proceeds received in the settlement of the Agwi litigation. Other minor adjustments were made. The Federal income tax return filed by decedent for the year 1921 was not a false or fraudulent return with intent to evade tax. Opinion KERN, Judge: The first issue for our consideration is whether the determination of deficiency was properly addressed to the petitioner as executor of the decedent's estate. This question was originally raised in the petition and prior to the consideration of this case on the merits, petitioner moved that this Court determine that the respondent erroneously addressed the determination of deficiency to the petitioner, *161 and that an order of no deficiency be issued in this proceeding. Arguments on the motion was heard and the motion denied, but the Court stated that the parties were not foreclosed from presenting the matter again on brief, which they have done. Petitioner contends that the proposed deficiency can not be properly assessed against it because its fiduciary capacity as executor of the decedent's estate has been terminated and it gave notice of such termination as required by section 312 of the Internal Revenue Code[7] to the respondent prior to the issuance of the notice of deficiency. Respondent claims that petitioner's capacity as executor of the decedent's estate has not terminated and contends that, therefore, petitioner has not been able, under the regulations, to give notice of termination. *162 Thus, the primary question for our decision in a consideration of this issue is whether petitioner's capacity as executor of the decedent's estate has been terminated. The parties here agree that we must look to the law of the State of New York for our answer to this question. We might well have considerable difficulty in determining the correct answer were it not for the fact that the hands of two eminent jurists are outstretched, so to speak, to guide us thereto. In Hulburd v. Commissioner, 296 U.S. 300, Mr. Justice Cardozo, said, with respect to the law of New York: "* * * Some states, though they make provision for an accounting, make none for a discharge, and hold the executor suable after the estate has been distributed upon the chance that other property may be discovered later on. The judgment will be collectible out of assets in future, or quendo acciderint, as was said in early days. * * * This, in effect, is the practice in New York [citing cases], where a judicial settlement of accounts is conclusive as to the past, but is never ultimate in the sense that it relieves the fiduciary from liability for the future. * * *" It is true, as petitioner points *163 out, that Justice Cardozo's comments on the New York law in the Hulburd case, which involved the law of Illinois, may well be considered gratuitous, but, as Circuit Judge Learned Hand pointed out in Olson v. Helvering, 88 Fed. (2d) 650, we may not take these utterances lightly. In the Olson case, Judge Hand, who was considering the law of New York, stated: "* * * The whole matter was before the Supreme Court in Hulburd v. Commissioner, 296 U.S. 300, 56 S. Ct. 197, 80 L. Ed. 242, where it was held that if under the local law discharge by the probate court of an executor or administrator completely ends his power to represent the deceased - to continue his 'person' - he is exempt from further assessment. After an extended consideration of Illinois law the court there concluded that in that state the discharge did just that, and it therefore declared the assessment invalid. It seems to be supposed that for this reason the assessment at bar was equally void, but that is true only in case the law of New York is like that of Illinois. We should be obliged to examine that question for ourselves, were it not that in the course of the opinion in Hulburd v. Commissioner, supra, *164 Mr. Justice Cardozo discussed also the law of New York, which he found to be unchanged from the common-law. It is quite true that this was not essential to the result, but we should nevertheless not feel free to re-examine a question thus deliberately considered, even though we knew where to find as persuasive an authority upon the law of New York." The language of the decree of the Surrogate's Court with respect to petitioner's "final accounting" an executor of the decedent's estate indicates that the Court merely intended to discharge the executor "of and from any and all responsibility or accountability for and in respect of any and all matters embraced in this accounting." There is nothing in the decree to indicate that the Court intended to discharge the executor as such. In view of the wording of the decree and of the law of New York as construed by the cited cases, we are compelled to reject petitioner's contentions, and hold that the notice of deficiency was properly addressed to the petitioner as executor of the decedent's estate. The next, and the principal issue herein, is whether the income tax return of petitioner's decedent for the taxable year 1921 was a false *165 and fraudulent return filed with intent to avoid tax. The burden of proof as to this question is upon respondent, and the proof offered must be clear and convincing. This burden of proof is, at best, a difficult one to meet since the ultimate fact to be proved is the intent or mental attitude of an individual. In the instant case it is particularly difficult, and properly so. Respondent's determination that a part of the deficiency was due to fraud was made on December 5, 1944, some twenty-three years after the close of the taxable year, and some fourteen years after the death of the taxpayer as to whom fraud was determined; and his allegation that decedent's return was fraudulent with intent to evade tax was made on April 26, 1945. A quarter of a century has elapsed since the transactions upon which the deficiency is based took place. These transactions were largely between and within the knowledge of four men: the decedent, his brother George, McSweeney and Mount. George died in 1919, the decedent in 1930, and McSweeney died at the age of 91 a few weeks after his deposition was taken in this proceeding, - a deposition which indicated a failing mind and memory natural to his advanced *166 age. Mount, who was the respondent's principal witness, admitted that he expected financial compensation if there was a collection of tax by the Commissioner, and indicated unmistakably at the hearing herein that he harbored a bitter hatred for his former associates. Thus, out of the four individual participants in the transactions before us, two were long since dead at the time of the hearing, one was incompetent and the fourth was obviously biased and prejudiced. Even if all four had been alive, mentally alert, and desirous of giving testimony uncolored by any emotion, it is doubtful whether their remembrance of things past would have been sufficient to give a clear and complete picture of all the facts incident to the case before us. The corporations created by these individuals are also dead and their records in storage. While many of these records, thanks to the amazing industry of counsel, have been introduced in evidence, a certain amount of chaos and incompleteness is inevitable. The record shows that, as to many of the most important transactions, the parties acted with an informality and looseness that would be incredible were it not for evidence disclosing that among *167 oil men such an informal and loose method of doing business was not unusual. Thousands of dollars and much effort was being expended on the strength of an ambiguous oral understanding which was subject to change, and which was finally reduced partially to a written agreement equally ambiguous and equally subject to change. One result of this has been the great difficulty to fit the venture of decedent and his associates into any legal mold, and thus determine the legal relationships created. For example, it is possible on the record before us to conclude that they were acting either as individuals, as partners, as corporation promotors and officers, or as joint venturers, and further, that as to some of the transactions they were acting in one capacity, and as to others, in another capacity. The actions of the parties to the transactions are not uniformly consistent with any one legal interpretation or characterization, but rather indicate that they themselves neither knew nor were particularly concerned with their exact legal status. Things were done, interests were transferred, money was expended, in a manner inconsistent with any characterization given by either petitioner or respondent *168 to the business enterprise or enterprises of the decedent centered in Mexico. Parenthetically it may be added that the political and economic conditions existing in Mexico in the period 1916-1922 were not without confusion. Against this background respondent contends that the decedent, in 1921, owned in his individual capacity a one-fourth interest in the oil rights referred to in our findings, that he knew that he was the owner thereof in that capacity, that he fraudulently caused the rights and interests here involved to be transferred to the Mexican Corporation and the income realized therefrom in the taxable year to be channelled through that corporation for the purpose and with the intent of evading Federal income taxes which would have been payable by him had it not been for his fraudulent conduct. The petitioner, on the other hand, contends that the decedent and his associates held title to the oil interests as trustees for the corporation, of which they were promoters, officers and directors, and that his conduct was only in conformity with his equitable duty. Each party points to many facts in the voluminous record before us which are consistent with his own hypothesis and *169 inconsistent with the hypothesis of his opponent. If the question now before us were whether the respondent correctly determined a deficiency in the decedent's Federal income tax for the year 1921, it might well be that on the record before us our decision would be for respondent. However, before this question can be reached, we must first decide that the decedent filed, not an erroneous, but a fraudulent return for that year, and we can only so decide if the respondent has established fraud by clear and convincing evidence. A mere preponderance of the evidence is not sufficient. Frank A. Maddas, 40 B.T.A. 572, 578. Neither is it sufficient that respondent has established that decedent was mistaken in his interpretation of his legal status quoad the Mexican venture. Mistakes in judgment and errors of law do not constitute fraud. See Duffin v. Lucas, 55 Fed. (2d) 786. After having given the entire record in this case the most careful consideration, we are unable to conclude that respondent has established, by clear and convincing evidence, that petitioner's decedent, who died in 1930, filed an income tax return for the year 1921 which was false and fraudulent *170 with intent to evade tax. Consequently, the statute of limitations bars any deficiency which may be due, and Decision will be entered for the petitioner. Footnotes
1. The record is not entirely clear as to the amount of money to be furnished by the Snowdens and McSweeney. There is some evidence that they were to furnish financial assistance up to $75,000.↩
2. Childress was an individual sent to Mexico by the Snowdens and McSweeney to inspect their holdings. He arrived in Mexico about November 9, 1917.↩
3. This litigation will be sometimes hereinafter referred to as the AGWI case.↩
4. The decedent kept detailed and voluminous books of account. Because of their confused detail, the frequent corrections and reversals of entries therein, the fact that entries are often described and identified by references to other books, not in evidence, and the fact that entries often refer to the books of Snowden & McSweeney Co. and the Indiana Mexicana Co., they were not of great help in a consideration of the transactions here in question. The comment may be made here, in passing, that a large part of the difficulty met in the consideration of this case was due to the chaotic accounting background.↩
5. In his brief and opening statement counsel for petitioner has explained these entries as follows: "From 1918 through 1921 a Mexican peso was worth one-half a U.S. dollar. The charge to Profit and Loss was made to correct the error of entering the stock of the two Mexican corporations as though its par value per share were one hundred U.S. dollars, when, in fact, such par value was only one hundred Mexican pesos." Although the record substantiates counsel's contention as to the value of the peso, it contains no direct evidence as to the par value of the stock, or as to whether it was in terms of pesos. However, since it was a Mexican corporation, it may be assumed that the par value of the stock, if any, was in terms of pesos.↩
6. This represents the difference between $24,900 and $18,827.48 plus an adjustment of $400. The record contains no explanation as to the reason for this adjustment.↩
7. SEC. 312. NOTICE OF FIDUCIARY RELATIONSHIP. (a) Fiduciary of Taxpayer. - Upon notice to the Commissioner that any person is acting in a fiduciary capacity such fiduciary shall assume the powers, rights, duties, and privileges of the taxpayer in respect of a tax imposed by this chapter (except as otherwise specifically provided and except that the tax shall be collected from the estate of the taxpayer) until notice is given that the fiduciary capacity has terminated. * * *
(c) Manner of Notice. - Notice under subsection (a) or (b) shall be given in accordance with regulations prescribed by the Commissioner with the approval of the Secretary. REGULATIONS 111. SEC. 29.312-1. Fiduciaries. * * * When the fiduciary capacity has terminated, the fiduciary in order to be relieved of any further duty or liability, as such, must file with the Commissioner written notice that the fiduciary capacity has terminated as to him, accompanied by satisfactory evidence of the termination of the fiduciary capacity. * * *↩